UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

MARIE HENRY,

                         Plaintiff,

    - against -                               **COMPLAINT**
                                          **JURY TRIAL DEMANDED**

CORNELL UNIVERSITY

                       **Case No: 3:24-cv-1215 (DNH/ML)**

                        Defendant.

───────────────────────────────

## COMPLAINT

      The Plaintiff, MARIE HENRY, by her attorneys, Schlather, Stumbar, Parks & Salk, LLP, as and for her Complaint, alleges:

### PARTIES

      1.      At all pertinent times herein, Plaintiff Marie Henry ("Henry" or "Dr. Henry" or "Plaintiff") is a citizen of the United States and resident of the Village of Cayuga Heights, County of Tompkins, State of New York.

      2.      Upon information and belief, at all times relevant herein, Defendant Cornell University is a private educational corporation, organized, chartered and existing under the laws of New York State, with its principal place of business located in Ithaca, Tompkins County, New York. Cornell enjoys significant public funding and is New York State's land grant institution.

      3.      At all times pertinent herein, Cornell University was and is known, and is referred to herein accordingly, as "Cornell" or "Cornell University."

      4.      At all times pertinent herein, Cornell owned, operated, and managed a university with principal offices located at 300 Day Hall, 10 East Ave. in the Town and City of Ithaca, County of Tompkins and State of New York.

      5.      At all times pertinent herein, Cornell is an employer within the meaning of 42 U.S.C. § 2000e-(b), New York State Executive Law § 292, and related provisions of law.

### JURISDICTION AND DEMAND FOR JURY TRIAL

      6.      The County of Tompkins, wherein Plaintiff resides and wherein Defendant does business, and wherein a substantial part of the events, acts or omissions giving rise to the claim

1

occurred, is within the jurisdiction of the United States District Court, Northern District of New York.  Accordingly, venue is proper under 28 U.S.C. § 1391(b)(2).

7.     This court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States.

8.     This Court has supplemental jurisdiction over all state common law claims pursuant to 28 U.S.C. § 1367 and related provisions of law.

9.     On or about August 25, 2022, Plaintiff properly filed a complaint alleging race discrimination, hostile work environment, harassment, and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"). Thereafter, on or about August 25, 2023, Plaintiff properly filed a second complaint with the EEOC alleging further race discrimination and further retaliation. Thereafter, the EEOC issued the Notices of Right to Sue for all claims on July 9, 2024 and July 11, 2024. Pursuant to these Notices, and within 90 days of receiving the same, Plaintiff is timely and properly commencing this action.

10.     Pursuant to FRCP § 38 and the Seventh Amendment of the United States Constitution, Plaintiff demands trial by jury in this action.

## SUMMARY

11.     Dr. Henry is a Black woman and a member of a protected group.

12.     Cornell is an educational corporation that employs more than 16,000 employees at its various facilities in New York State, including approximately 10,000 staff and faculty employees in Tompkins County, New York.

13.     Cornell hired Dr. Henry in early June 2021. Henry began work at Cornell on July 12, 2021.

14.     As more fully detailed herein, between July 2021 and June 2023, Cornell, by its employees - some of whom were subordinate to and others of whom were supervisory of Dr. Henry - and by its institutional policies, procedures, practices, devices, and stratagems perpetrated multiple acts of racist discrimination and retaliation against Dr. Henry.

15.     As more fully detailed herein, between July 2021 and June 2023, Cornell, by its employees - some of whom were subordinate to and others of whom were supervisory of Dr. Henry - engaged multiple pretexts and racist tropes, including use of the historic "house negro" stratagem, to hide its pernicious racist campaign to terminate Dr. Henry.

16.     At all times pertinent, and as more fully detailed herein, Dr. Henry was fully qualified for her position, and met or exceeded all job performance expectations and standards.

17.     Cornell wrongfully adversely changed material terms and conditions of Dr. Henry's employment and then terminated her on June 1, 2023.

# BACKGROUND

## CORNELL'S PROBLEM WITH RACISM BEFORE ITS HIRE OF DR. HENRY

18.     Prior to 2021 Cornell operated Cornell Health ("CH"), a unit within its Division of Student and Campus Life ("SCL"), including a CH facility on Cornell's Ithaca NY campus.

19.     Prior to and throughout 2021, racial discrimination was a problem at CH. Assistant Vice President Sharon McMullen ("AVP McMullen"), who was the most senior leader at CH at the time of Dr. Henry's hire, described racist atmosphere as **"*a public health crisis,*"** noting that **"*Cornell is early in its journey to anti-racism.*"**

20.     Dr. Jada Hamilton ("Hamilton"), the newly appointed Medical Director at CH, informed Dr. Henry that shortly before leaving Cornell, AVP McMullen told Hamilton, that "***there are people at Cornell Health that have a problem with the diversity of the Cornell Health Leadership Team.***"

21.     Hamilton herself has recalled that there was this ***young Black man***, who was an administrative support person working at the Level 6 desk: **"*He was nice. But they didn't train him at all.*"** **"*He was set up to not to do well, and he left.*"** She confirmed the all-too-often practice at Cornell of its taking credit for hiring people of color, but then not following through with training and support in the face of apparent bigotry, resulting in the departure of that employee.

22.     Indeed, Cornell University and CH had been unsuccessful in retaining people of color (especially Black people) in both their Senior Leadership and their staff. The data show that retention in this group was and remains very low at Cornell in all staff ranks. Many, but not all, black employees quickly discover the underlying racial bias in the climate at Cornell and simply leave.

23.     In 2020, AVP McMullen attempted to address the problem. Her goal was both to improve the efficient delivery of health services to students and to address the problem of racism as a public health crisis.

24.     In this regard, AVP McMullen merged the clinical nursing group (primarily Registered Nurses ["RN's"], Licensed Practical Nurses ["LPN's"], and Certified Medical Assistants ["CMA's"]) with the clinical administrative support group (Clinical Administrative Assistants ["CAA's"]) at CH, to bring them in line with best practices at most major hospitals and similar university facilities. The product of this merger was the newly established Department of Nursing and Clinical Support Services ("NCSS").

25.     In relevant part, the reporting structure for NCSS included its Director reporting to AVP McMullen who in turn reported to Ryan Lombardi ("Lombardi") as Vice President for the Division of Student and Campus Life (SCL) at Cornell. In turn, the Director of NCSS supervised four Nurse Managers and the Assistant Director of the CAA's.

26.     AVP McMullen also hired Dr. Henry as the first Director of NCSS, later expressly stating that her "goal was indeed to diversify senior leadership."

27.     Before Dr. Henry started in July of 2021, although NCSS was the largest department in CH, with over 70 employees, there were almost no people of color in NCSS.

**DR. HENRY IS HIRED**

28.     Following a four-month national search using a successful and highly respected search firm, Keeling and Associates, whose specialty included leadership positions in health services at educational institutions, Cornell hired Dr. Henry in May 2021.

29.     Dr. Henry, a Black female of Jamaican heritage came with exceptional and broad experience in the hospital setting (most recently as a Nursing Administrator at Mount Sinai Hospital in New York City). She had an outstanding education, being a Family Nurse Practitioner (MSN from Columbia University) and a Doctor of Nursing Practice (DNP from Quinnipiac University).

30.     On July 12, 2021, Dr. Henry began her work as the Inaugural Director of NCSS at CH on the Cornell campus in Ithaca, New York.

31.     Relevant to this case, Kristi Coffelt ("Coffelt") was the Assistant Director for the CAA's, reporting directly to Dr. Henry as Director of NCSS.

32.     Relevant to this case, Christopher Payne ("Payne") was the Senior Director of CH and Director of its Administrative Services Department, another unit at CH that was parallel to NCSS. Payne and Dr. Henry were at the same level of senior leadership at CH, each directly reporting to AVP McMullen.

**COFFELT'S RACIST INSUBORDINATION BEGINS IMMEDIATELY AFTER DR. HENRY IS HIRED**

33.     Beginning the first week of Dr. Henry's appointment as Director of the new NCSS Department, and continuing throughout Dr. Henry's tenure at CH, Coffelt, refused to acknowledge Dr. Henry as her supervisor, and refused to cooperate, in the functioning of NCSS.

34.     In her role, Coffelt was required to:
   a. submit all time-off requests;
   b. get approval for staff hiring;
   c. engage in regular reporting to Dr. Henry on the activities of the CAA's whom she supervised and her own activities; and,

d.   collaborate with Dr. Henry regarding any disciplinary action to be taken against any staff whom Coffelt supervised directly or indirectly.

35.    Cornell was clear both in its organizational chart for NCSS and in its related job descriptions for all positions in NCSS as to the respective job duties and reporting requirements of each Cornell employee in NCSS.

36.    Other than Coffelt, none of the other 70+ staff members in NCSS Department expressed any difficulties in understanding this reporting structure and their respective job duties. As detailed below, Coffelt was singular in her persistent insubordination, insolence, and biased treatment directed towards Plaintiff.

37.    For example, in the first week of Dr. Henry's new role as NCSS Director, Coffelt demanded that Dr. Henry write a new formal job description for her in HR.

38.    In the succeeding weeks, Dr. Henry had several similar experiences and consequent discussions with Coffelt regarding her emerging, insubordination and lack of cooperation. The incidents included:

a. asserting that Don Pizarro, a CAA support person did not have the "bandwidth" to provide support to Dr. Henry notwithstanding, that AVP McMullen had told Dr. Henry that Pizarro would be her support staff, and Pizarro had assured Dr. Henry that he was available for that purpose. Upon learning of Coffelt's obstruction, AVP McMullen made clear that Coffelt's claims were false;

b. even as she declined to make Pizarro available to Plaintiff, Coffelt implemented AVP McMullen's assignment of Pizarro to support Dr. Alecia Sundsmo (a recent white female hire) as Director of Counseling and Psychological Services ("CAPS") and other white staff who were at or below Plaintiff's level;

c. departing for vacation in August 2021 without providing any requisite report or update to Dr. Henry about CAA activities;

d. assigning a NCSS screener to work outside of NCSS (to approve CAPS payroll) starting in the Fall of 2021, at a time when NCSS itself was short-staffed administratively, all without informing Dr. Henry;

e. trying to "weaponize" (the term used by a staff person involved) CAA Supervisors against Dr. Henry by asking them to constantly disrupt NCSS leadership meetings in Fall 2021;

f. encouraging CAA supervisors to watch and laugh as Coffelt badgered Dr. Henry and addressed her derisively in 'Zoom' meetings of NCSS leadership; and,

g. otherwise failing to partner and collaborate with Plaintiff in various matters that impacted NCSS, its staff and workflow.

## COFFELT'S "CLEANING A BATHROOM" INSULT AND CORNELL'S FAILED RESPONSE

39.     On September 1, 2021, Coffelt sent an e-mail to the Plaintiff containing the following language:

> *"Hi Marie, I was really impressed with you in your interview because you spoke about how you were willing to do whatever needs to be done, even down to cleaning a bathroom if that is what's needed. In this time of limited staffing resources, I am disappointed that this willingness to dig in does not include being willing to take responsibility for your own note taking, as the directors of the other departments have done for their small group meetings….."*

40.     In response, AVP Sharon McMullen replied:

> *"This is a breath-takingly inappropriate email to such a broad distribution list."*

41.     Despite Plaintiff's extensive professional credentials and experience, Coffelt could only envision that Plaintiff is someone to "clean a bathroom." This first exemplified Coffelt's racially biased mindset and even racial animus as evidenced by her relentless insubordination and undermining behavior throughout Plaintiff's employment at Cornell as NCSS Director.

42.     This offensive email was duly reported to Shan Varma, the HR Director of SCL ("Varma"). Varma and Dr. Henry then had a conversation, excerpts of which follow:

> **Shan Varma**
> *……These other comments she said after that are really inappropriate. They're not professional. And they are not what you would expect somebody to say to anybody else on the team, let alone their supervisor? Right? Right, anyone else on the team, let alone their supervisors. So that, I think, is important, because, you know, when, when I think about professionalism, and the way we want to be kind of communicating with one another, I don't think that's the tone. That's not the tone we want to take.*

> **Marie Henry**
> *Right.*

> **Shan Varma**
> *That, is, that is inappropriate, that is inappropriate. And then I also coupled it with the fact that you're new to the organization. You know, when somebody's new to the organization, again, to be a professional, we all owe it to kind of what's the word to kind of help to acclimate the person to things. And her doing that so early in your tenure is not helpful and calm. … And that's that is that actually undermines your role as a supervisor.*

> **Marie Henry**
> *And then she attempted to pull a staff in on the following day, and send out another blast email as if to reprimand me, …*

6

**Marie Henry**
*The bath, you mean the bathroom? ...…...*

**Shan Varma**
*But no, that's, that's, yeah, that was, that was shocking to me. …..*

**Shan Varma**
*That was shocking. …..*

**Shan Varma**
*No, I mean, that was that was very uncouth. That was very jarring to me.*

**Marie Henry**
*Yes.*

**Shan Varma**
*Very jarring. Like I've, yeah, I haven't seen anything like that. never, I've never seen that ...*

**Marie Henry**
*Yeah, I have never,  ...seen anything like, that.…...*

**Shan Varma**
*Yeah, let alone all these other people copied that, that. So this is what I'm saying something is not, yeah something is there's some there's a there's a large issue. ...*

**Shan Varma**
*At the at the outset. Right this one time? I think it's good because you're, you're on the verge of delivering discipline, I think having the conversation, right? You want to say in no uncertain terms, that, that when she's in doubt, you don't want her to send another email like that, full stop, just do not, do not she should walk on 5G. In fact, you guys are neighbors, right?  …*

**Marie Henry**
*Yeah.*

**Shan Varma**
*One professional to another. This was, this was not okay. And I'm not going to have it happen again. That's it. So, right, you should not get this this really odd like where this is coming from?*

*You know, John? John [Dr. John Clarke] told me a while ago that he was having some struggles with her too.*

**Marie Henry**
*Right Really wow!*

**Shan Varma**
*Yeah. So I'll just, you know, um so, so I think, I think, you know what she's been given this latitude to be really, you know, I was, I was thinking, **I don't know, is it a race thing?** ...*

**Marie Henry**
*Whatever, whatever her issue is. It does not look good, looks really horrible.*

**Shan Varma**
*No it doesn't look good. And it's not. It's not behavior that comports with a supervisor, a supervisor, who then has and, you know, you know, what's most kind of disheartening and undermining is, that she's saying these, these kind of uncouth things, and people that report to her.*

**Marie Henry**
*Right.*

**Shan Varma**
*See it.  Yes.  And what that means in some way, is, she is going to, she, in somehow, some way, is sanctioning them to do similar stuff.*

43.     Varma's above reference to "John" is to Dr. John Clarke, a Black man and distinguished doctor with several degrees. At the time, Dr. Clarke was Director of Occupational Medicine in Cornell Health.  Sometime later, Dr. Clarke told the Dr. Henry about his bad experiences with both Coffelt and Payne, which he attributed to their mindset of racial bias, and left Cornell for other employment.

44.     Following this exchange and in the many months to follow, Varma proved incapable of supporting Plaintiff in her professional dealings with Coffelt.

45.     Thereafter, Plaintiff had numerous discussions with Varma regarding Coffelt's behavior, even breaking down into tears, but Varma continually deflected the conversation away from Plaintiff initiating disciplinary action against Coffelt, giving many excuses.

46.     On one occasion, about six weeks later when discussing Coffelt's behavior with Plaintiff, Varma seemed resigned to the fact that at Cornell "***people have connections***", and therefore are immune from being held accountable. This discussion occurred in mid to late October of 2021, during Cornell University Trustees Meeting Week.

47.     Dr. Henry and Varma were discussing multiple recent incidents of Coffelt's disruption and insubordinate behavior. A portion of this late October 2021 conversation went as follows:

**Shan Varma**

*… I'm gonna say within, within the University. Right. So it's good if -- because I was I was thinking about how to bring this up to you. So, I'll just jump ahead a little bit. This, **so my time at the University has been a learning because we, we, as an institution, rarely practice this thing, which is called trying to create like a, like a caring community**.*

*So I'm going to say when I, when I worked with other employers, I've been here a fair amount of time now. But, when I was when I was working for …  I spent like 15 years here, then I also spent about a decade out in California. **And I've worked for multiple employers in California. And I'm gonna say that the approach for performance and performance management is very different within this landscape,***

8

*than in others. And I'm going to tell you why that's the case. And it's taken me a while to kind of, for this to sink in, and kind of, so I can appreciate it, Right?*

*So the so the connections that people have with the community with one another, they're, they're long-standing. They're deep,* we don't like sometimes, you know, I'll tell you, it doesn't matter who I make a connection, whoever I'm talking to, this is the same sort of approach that I take, which is to try and try and have conversations with people to engage them in the employment with us, which meets our expectations.

*And then having additional conversation before we go into discipline. To make sure again, that there is clarity and coaching in real time, I'll say as much as I can, in real time and space, to say I observed this.*

*Here's, here's what I would appreciate going forward ...*

48.     Varma said the above to the Plaintiff in relation to the behavior of Coffelt and Payne. The implication was that some people are essentially untouchable and therefore, will be immune from discipline. Varma had stated to Plaintiff that the kind of things that go on at Cornell could not happen at his previous places of employment.

49.     In the latter part of the conversation Varma essentially directed Plaintiff not to take the disciplinary route. Varma went on to say that "*Cornell Health is under a microscope.*"

50.     Also, regarding Coffelt's "connections" Varma once referred to Mary Opperman, then the Cornell VP for Human Resources, as being an insulating and protective factor.

51.     Varma did not want issues of race and gender at CH to be exposed, thus adding to the scrutiny of CH by the Board of Trustees.

52.     Issues with insubordination, disruption, disrespect, and neglect of her responsibilities continued thereafter.  Coffelt canceled and failed to honor numerous one-on-one meetings spanning September 2021 through early May of 2023 and engaged in multiple acts of insubordination, exclusion, imposition of inequity, belligerent verbal aggression, bias treatment and acts of undermining directed at Plaintiff.

53.     Varma had knowledge of Coffelt's behavior.

54.     Varma was unwilling and/or unable to do anything about Coffelt's behavior.

55.     This overt bad behavior progressively shifted to being more *covert* in summer of 2022, and especially after September 27, 2022, when Dr. Henry was placed under the supervision of Hamilton by Lombardi.

56.     Throughout, Varma and later Lombardi, his Chief of Staff Melanie Ciotoli ("Ciotoli"), and Hamilton would shield and protect Coffelt, even siding with Coffelt despite her insubordinate and racist behavior, some of which was witnessed by Hamilton.

57.     In contrast, Coffelt never engaged in such insubordinate and related misconduct when under the supervision of Dr. Anne Jones, a White woman, who had supervised Coffelt before Dr. Henry.

## PAYNE REFUSED TO PROVIDE ADMINISTRATIVE SUPPORT TO PLAINTIFF

58.     A critical issue that emerged right from the beginning of Plaintiff's tenure at CH stemmed from CH's use of the Point and Click ("PnC") health record and scheduling system and software, whereas Plaintiff's experience was with the more complex EPIC system used at Mount Sinai and other major hospitals.

59.     Such a mismatch in health record software experience and training was a frequent issue with new hires, especially at the administrative and director level.

60.     Furthermore, the CH version of the PnC system had features unique to CH.

61.     Thus, the Plaintiff would need to receive tutoring and training in the PnC system by specialists in the Administrative Services Department of Cornell Health, which was under Payne.

62.     Notwithstanding multiple requests by Plaintiff, and direction by AVP McMullen, Payne withheld from Plaintiff support and training in the PnC system. This intentional withholding of support and training by or at the direction of Payne continued until April of 2023.

63.     In stark contrast, in October of 2022, Payne and his team began to make extensive preparations for Dr. David Reetz ("Reetz"), the incoming Director of CAPS, who like Plaintiff, had no PnC training prior to working at Cornell University. Reetz was a White male.

64.     Payne verbalized in a CH Senior Staff meeting the need to prepare for extensive training for Reetz in PnC.

65.     Payne's organizational line to both Plaintiff and Reetz was the same at the time of each occurrence. However, Reetz, a White male, was lavished with training and tools to thrive and flourish in PnC, while Plaintiff, a Black female, was not.

66.     Despite the fact that this lack of training of Plaintiff was expressly acknowledged by Payne as early as March 2022, Payne's denial of PnC training continued into April of 2023.

## PAYNE OTHERWISE DID NOT SUPPORT PLAINTIFF AS DIRECTOR OF NCSS

67.     Also, during approximately the first three months following Plaintiff's hire (July, August and into September 2021) Payne intentionally failed to create and establish external and internal documents and data, including websites and employee affiliations, that reflected the creation and establishment of the new NCSS department and Plaintiff's role as the NCSS inaugural Director. During these months Plaintiff was the only published member of NCSS until Plaintiff pointed this out to AVP McMullen.

68.     This lack of online documentation undermined Plaintiff's authority and new role within CH as the inaugural Director of NCSS.

69.     On December 31, 2021, Payne sent an email to CH Leadership and more broadly, about the future of CH now that AVP McMullen had announced her departure from CH and Cornell. In that email, Payne listed each involved department but did not list NCSS, notwithstanding that NCSS was directly involved in that topic.

70.     Later in a March 29, 2022 document, Payne attempted to brush this aside as an oversight in writing a draft; however, later documents and his CV in Spring of 2023 showed this omission to be a pattern in his behavior.

71.     In May 2022, during a Cornell budget presentation, in an effort to diminish Plaintiff's stature and authority, Payne deliberately exposed to attendees Plaintiff's salary, while redacting the other high salaries of Sundsmo and other senior leaders.

## COFFELT AND PAYNE COLLUDE IN THEIR RACIST DISCRIMINATION AGAINST PLAINTIFF

72.     Beginning mid July 2021, Payne, in collusion with Coffelt and others at Cornell intentionally discriminated against Plaintiff in comparison to then CAPS Director, Dr. Alecia Sundsmo.

73.      Payne and Coffelt denied support to Plaintiff who was Black, and all the while provided such support to Sundsmo, a White female peer.

74.     After the November 2021 departure of Pizarro, who had been assigned by McMullen to be the support person for both Plaintiff and Sundsmo, Payne in collusion with Coffelt and others at Cornell intentionally withheld staff from Plaintiff for Outlook scheduling maintenance, and other duties, while at the same time providing support staff to Sundsmo.

75.     Also, during this time Coffelt was meeting regularly with Payne and would pull him into email threads on matters that did not pertain to his Administrative Department. Payne's engagement of Coffelt appeared to embolden her aggressive actions towards Plaintiff.

11

76.     During Fall 2021, while in Coffelt's presence, Payne undermined the Plaintiff by speaking condescendingly and abruptly interrupting and cutting her off in meetings – literally mid-sentence. Such aggressive and belligerent interruptions even occurred in Zoom meetings where Coffelt and her CAA supervisors were in attendance.

77.     In one such meeting, Payne first cut off Dr. Henry, and then proceeded to ridicule an idea Dr. Henry was presenting. Shortly thereafter, one of Dr. Henry's nurse managers stepped in and repeated the basic information and idea that Dr. Henry had just presented.

78.     Astonishingly, Payne praised the nurse manager (a White female) by saying "great idea" which, in fact, was verbatim the idea Dr. Henry had just described.

79.     Payne bypassed Plaintiff in communicating with Coffelt and others among Plaintiff's staff. Coffelt and some CAA supervisors who reported to Coffelt then intentionally bypassed Plaintiff, and otherwise interfered with her staff supervisory authority.  At the same time Payne refrained from such bypassing of Sundsmo regarding staff in her CAPS department.

80.     After Pizarro's departure in November of 2021, Payne indicated that it was Plaintiff's responsibility to be the Search Support Coordinator with HR in the hiring process for Pizarro's replacement. Payne stated that "his staff was too busy."

81.     Eventually, Katherine Ballard from Payne's team happened to notice Plaintiff attempting this difficult and time-consuming task. Not knowing of Payne's claim that "his staff was too busy", Ballard reached out in an email to Payne, HR and Plaintiff, in which she offered that Debra Walls, another subordinate of Payne's, was available to take on this task, which she did with enthusiasm.

82.     On December 21, 2021, Payne intentionally excluded Plaintiff from a necessary professional consultation about appropriate medical advice to Plaintiff's NCSS staff regarding such staff administering Covid booster vaccine to one another and to other CH staff. Instead, Payne, not being qualified or knowledgeable, on his own inaccurately instructed NCSS staff to vaccinate one another and other CH staff, all of which is a prohibited federal act; in consequence, he put nursing staff licenses at risk, put the health of CH staff at risk, and put Cornell as an institutional medical provider at risk.

83.     In Fall 2021, AVP McMullen was given multiple updates regarding how Payne's disrespect and denigration of Dr. Henry had emboldened some members of Dr. Henry's staff to bypass her and to go directly to Payne with issues that were properly within Henry's purview.

84.     Upon information and belief, AVP McMullen addressed the issue with Payne.

85.     Nonetheless, when emails inappropriately were sent to Payne by Coffelt and some of the CAA supervisors, who reported to Coffelt, Payne continued to encourage the same

behavior notwithstanding his clear understanding (and the related counsel by AVP McMullen) that such a practice undermined Plaintiff.

86.    As a result of such undermining, Plaintiff was late in learning of important situations/changes within the NCSS department, particularly in dealing with the CAA discipline that reported up through Coffelt.

## MEETING OF JANUARY 3, 2022: DR. HENRY, PAYNE, VARMA AND AVP MCMULLEN

87.    In a meeting held on Monday, January 3, 2022, Plaintiff outlined her concerns about her biased treatment by Payne in the months since joining CH as NCSS Director on July 12, 2021. These were described as being a source of stress in their working relationship, and examples were provided.

88.    Plaintiff stated that to make progress in repairing the working relationship between Payne and Plaintiff, Payne would need do several things, including:
   (i)    providing proper support and ensuring proper training in the PnC system,
   (ii)   refraining from interfering in NCSS department matters that should be handled by its Director, Plaintiff,
   (iii)  refraining from excluding Plaintiff from e-mails discussing critical matters that impact the NCSS department and its staff, and
   (iv)   directing Ms. Coffelt to not circumvent Plaintiff in CAA matters, such as hiring staff without Plaintiff's knowledge and otherwise going to Mr. Payne, which remained an issue.

89.    Plaintiff pointed out that this was all behavior that Payne had embraced when interacting with the Plaintiff's White peers, but not when interacting with Plaintiff as Director of NCSS.

90.    At the end of the meeting, Plaintiff provided to all participants a written document that summarized her concerns and examples.

91.    Just prior to this January 3, 2022, meeting, Payne went to Plaintiff's office door and formed a heart sign with his two hands with an affectation of sleepy eyes.

92.    This startled and offended Plaintiff who felt this was an attempt at manipulation, even sexual harassment. Upon information and belief, Payne had been made aware before the meeting that Plaintiff was about to raise some serious concerns about Payne's behavior.

93.    At the end of the meeting, AVP McMullen directed Payne to respond in writing to Plaintiff's document. Payne's response was to be provided to all participants within a week. Varma was to follow up with Payne to ensure that this was done.

94.     Payne did not respond as directed. AVP McMullen left Cornell shortly thereafter, in January 2022. Varma's follow up was limited and ineffectual.

## CORNELL FAILED TO FOLLOW UP  (JAN. - JUNE 2022)

95.     Later, on her own initiative, Dr. Henry met with Sonya Rucker, Associate Vice President for Inclusion and Belonging at Cornell, and discussed the concerns expressed in her January 3, 2022 document and their context. Nothing substantive happened.

96.     Plaintiff subsequently agreed to try an avenue as instructed by Varma known as '*Facilitated Conversations*' through Organizational and Workforce Development (OWD).

97.     She participated in good faith in the facilitated conversations, because Varma had said that these *facilitated conversations* would explore the circumstances between Payne and Plaintiff from the time she had begun employment at Cornell Health to the end of December of 2021, and that they could lead to resolution of the issues she had raised and an improved professional working relationship.

98.     In fact, the facilitated conversation process did not probe past events nor pressure the parties to talk through what had happened and to develop plans to fortify against recurrence.

99.     After two sessions, it was clear that Payne was well known to the team of facilitators, and his evasive and deflecting excuses were not being challenged by the team. The process failed.

## PAYNE CONTINUED HIS OFFENSIVE AND BIASED BEHAVIOR

100.     After January 3, 2022, Payne continued to engage in his offensive and racially biased treatment of Dr. Henry. This included:

   (i)     exclusion of Dr. Henry from various meetings, e-mails and decision-making processes that pertained to Dr. Henry's department, NCSS,

   (ii)     interfering in NCSS departmental matters,

   (iii)     continuing to withhold, even hide the several weeks of onboarding and administrative support, including extensive PnC software training that was not withheld from others under similar hiring and onboarding circumstances.

101.     For instance, on February 3, 2022, Payne intentionally excluded Dr. Henry from two inclement weather planning meetings/conversations that were occurring among CH Leadership, of which Henry is a key part. Instead of asking Henry to join the meeting, Payne instructed Hamilton (at the time, Henry's peer) to call Henry and to give her instructions without context.

102.    During those meetings and conversations, a plan was developed that directly involved Plaintiff's NCSS workforce. NCSS staff subsequently became upset at this lack of representation and the dictatorial nature of the directives.

103.    On March 25, 2022, in response to a CH-wide email sent by an NCSS staff seeking to start a collection to acknowledge the passing of a family member of another NCSS staff, Payne hastily and intentionally preempted Plaintiff from exercising her NCSS leadership responsibility, under CH practice and policy, for acknowledging such a loss.

104.    Without consulting Plaintiff, Payne interfered and met with Plaintiff's staff member and subsequently made arrangements to send out a gift basket.  At first sight, Payne's actions might seem minor, except that they intentionally undermined the relationship Plaintiff was seeking to establish with this NCSS staff member who was a problematic ally of Coffelt.

## MEETING BETWEEN VARMA, CIOTOLI, AND PLAINTIFF

105.    On April 8, 2022, Varma arranged for a meeting between Plaintiff, Varma and Ciotoli (Chief-of-Staff to VP Lombardi, who then was Plaintiff's supervisor).  In this brief 5-minute exchange, there was some discussion about needing to explore Payne's "*authority, or perceived authority*" and the idea that a lot of authority appeared to be given to one person, "*… whether it was given or taken … however that authority was achieved. That's pretty significant. …*".

106.    Ciotoli promised to follow up with another discussion after the following week since the meeting had to be cut short unexpectedly. However, there was no follow-up --- until two months later, on June 8, 2022.

## PLAINTIFF IS NOT GIVEN THE OPTION OF FORMAL MEDIATION

107.    Later in May and June of 2022, Plaintiff discovered that the Office of Institutional Equity and Title IX at Cornell ("OIETIX") could have sponsored an internal, formal Mediation process between Plaintiff and Payne, which was apparently an available option under Cornell Policy 6.4.

108.    Such mediation would have allowed for more serious investigation/consideration of the type of incidents in Plaintiff's 1/03/2022 document and could have led to imposing enforceable actions, agreed on by both Plaintiff and Payne, that would hold Payne accountable.

109.    This option was never proposed, but rather the milder and predictably less effective '*Facilitated Conversations*' approach was proposed.

110.    In denigrating comments regarding the Plaintiff, Lombardi later claimed in a June, 22 2022 letter to AVP Rugless in charge of OIETIX, that OWD's *'facilitated conversations'* were "*Mediation*" from which Plaintiff had withdrawn; but, this was false.

### PLAINTIFF'S JOB PERFORMANCE MET OR EXCEEDED ALL OBJECTIVE STANDARDS AND EXPECTATIONS

111.    During the first six months of Dr. Henry's employment, AVP McMullen was Henry's supervisor. AVP McMullen fully supported Henry and was completely satisfied with her job performance. In her last conversation with Plaintiff prior to departing Cornell, McMullen acknowledged Plaintiff's loyalty and at times frankness, in giving McMullen good advice. She even said: "*I wish I'd had two of you*!" McMullen later kept in touch, even offering Plaintiff the possibility of collaborating in consulting opportunities.

112.    AVP McMullen's assessment of Dr. Henry was borne out by a subsequent 360° leadership assessment of Dr. Henry conducted in April 2022.

113.    Plaintiff attended the ***Harold D. Craft Cornell Executive Leadership Program*** from April 11 to 15 of 2022. As part of that program all participants engaged in a ***360° Leadership Assessment***.

114.    Despite the low NCSS morale Plaintiff had inherited when joining CH in July of 2022, Dr. Henry received high marks from her peers and direct reports as well as many positive written comments. The scores and comments were:

***Marie Henry (Plaintiff) 360 scores:***

*Overall Scores by Rater Group (out of 5):*

| | | |
|---|---|---|
| *COLLEAGUES* | *4.39* | *(Norm 4.30)* |
| *DIRECT REPORTS* | *4.41* | *(Norm 4.35)* |
| *SUPERVISOR (VP Lombardi )* | *3.69* | *(Norm 4.32)* |
| *OVERALL* | *4.32* | *(Norm 4.36)* |

***Verbatim Comments from Direct Reports regarding Plaintiff:***

- *Marie advocates for the department to ensure that staff have the support and tools they need to perform their roles.*
- *Marie gives staff opportunities to participate in projects and leadership roles based on their interest and abilities.*
- *Marie is really great at lifting staff up, giving them opportunities and engaging staff in important decisions.*
- *Marie sees and understands the value of work-life balance and is supportive of staff in times of need or challenges.*
- *Marie shows that she trusts and has confidence in staff and her direct reports and gives people space to complete projects. It is also very clear that she values input from staff.*
- *Marie finds the time to engage with all staff. will find out the answers to questions - or go to the person who has the correct answer, and then bring it back.*
- *Marie leads her team from the front and always takes a stand on her team's rights.*

16

115.    In the otherwise very positive 360° evaluation, a below average score was given by Lombardi, Dr. Henry's new supervisor. Notably, Lombardi had only met once with Henry - in early February of 2022, but had met multiple times with Payne in that same time period. Significantly, as detailed below, Lombardi was supporting, and was promoting, Payne at CH. Upon information and belief, Lombardi already was revealing his own biases against Henry and her claims against Payne.

116.    Nevertheless, given Dr. Henry's high marks, Lombardi had no real choice but to award her a bonus of $1,500 on June 13 of 2022.  Such bonuses were given to only 10% of the staff in SCL. In her bonus letter, Lombardi wrote:

> *June 13, 2022*
> *Marie Phoenix Henry*
> *914 Highland Road*
> *Ithaca, NY 14850*
>
> *Dear Marie,*
>
> *Over the course of the past year, our work in Student & Campus Life has continued to be impacted by one challenge after another. Through the ups and downs, you have shown commitment to our goals and demonstrated strong performance along the way.*
>
> *In recognition of your specific contributions over the year, I am pleased to provide you with a one-time performance-based bonus of $1,500. This amount (minus applicable taxes) will be present in your June 15, 2022, paycheck, and is in addition to your upcoming July 1, 2022, salary increase.*
>
> *We are grateful to have you as a colleague, and I look forward to our continued work together. Thank you again for everything you do as a part of the Student & Campus Life team.*
>
> *Sincerely,*
>
> *Ryan*

117.    In the summer of 2022, CH staff were surveyed. The purpose was to develop consensus on the current climate and future direction of CH, and especially in finding a new leader to replace AVP McMullen. Rather than being a paper survey, the format was to partition the staff into small groups, each of which would have a facilitator and a note-taker, in order to record key elements of discussion.

118.    These facilitated group meetings occurred during late July and early August. Generally, the overall responses of staff were quite positive. There was no wellspring of concerns that demanded changes, and the relatively few negative viewpoints got no traction.

119.    The only criticisms of NCSS and Plaintiff's leadership thereof was Coffelt complaining about self-serving bonus issues.

120.    In a follow up larger CH forum with Lombardi on August 9th, of 2022, the consensus of NCSS staff, as strongly expressed to Lombardi, was in substance, "*Why change things? Things are going great.*"

121.    In other words, after one year on the job, Dr. Henry had brought NCSS a long way. The NCSS staff and many others clearly supported her and her job performance.

122.    Dr. Henry's good work at NCSS was further recognized in the Spring 2023, when she applied for AVP McMullen's vacant position, then referred to as 'Executive Director' (ED).

123.    Although, Dr. Henry did not get the job, she received many positive comments regarding the overall strength of her application, her work performance at CH, her credentials, and her life story as coming from a poor family in Jamaica where her parents were illiterate, emigrating to the US as a teenager, and putting herself through school while working – sometimes three jobs.

124.    The Cornell Screening Committee found that Dr. Henry was *very enthusiastic and passionate about what she was doing, and that she was deeply committed to the work that she does at CH*.

125.    The Committee said that *Dr. Henry had made some very healthy and good choices in what she was getting accomplished at CH, and the committee really appreciated that*. *The committee noted that Henry was deeply respected and admired*.

126.    The Committee's favorable response to Dr. Henry's application for the Executive Director Position of CH, and the related very positive and complimentary comments and feedback about her talents and accomplishments, confirm that by reasonably objective standards of unbiased people, Dr. Henry was highly qualified and excelled in her work at CH.

## LOMBARDI IGNORES DR. HENRY

127.    Upon AVP McMullen's abrupt departure in January of 2022, VP Lombardi immediately became Plaintiff's direct supervisor. On February 22, 2022, Lombardi had his first (and only) 1-on-1 meeting with Plaintiff (on Zoom) to discuss the status and her future plans for the NCSS department. The meeting lasted 35 minutes.

128.    Thereafter in the almost 6-month period between February 22, 2022 and August 3, 2022, Lombardi had no further, 1-on-1 meetings with the Plaintiff.

129.    He did, however, receive weekly written reports from Plaintiff updating him on NCSS operations, as he did also from the other Directors including, Payne.

130.    Upon information and belief, Lombardi met regularly with the other Department Directors, and, after the departure of Sundsmo, the CAPS Director, in May of 2022, he met with the CAPS Assistant Directors.

18

131.    And yet, Lombardi met with Plaintiff only once during this critical period, even though **NCSS housed about one-third of CH staff**.

132.    In contrast, upon information and belief, Lombardi and Payne were in contact on a regular basis, and Payne had virtually unlimited access to Ciotoli, Lombardi's Chief of Staff.

## COFFELT'S CONTINUED INSUBORDINATION AND RACISM

133.    Pizzaro's replacement - who directly reported to Plaintiff - was finally hired and began work on March 3, 2022. The new hire, **Tariq Nawab,** was required to be trained in PnC software.  Dr. Henry directed Coffelt to train or arrange this training since Coffelt had ample time available.

134.    For four months thereafter, and despite being reminded several times, Coffelt ignored/disregarded Plaintiff's directive. And yet during this period, Coffelt successfully trained or arranged for the training of a new CAA Supervisor, Johanna Klein, who was hired into that role several weeks after Nawab was hired.

135.    Coffelt finally began the training of Nawab around mid-July of 2022.

136.    In another incident, Coffelt willfully refused to notify or engage Plaintiff in a discussion regarding the serious matter of having initiated disciplinary action against a CAA staff member in NCSS, where Coffelt already had taken punitive action by reducing the staff member's work hours.

137.    Coffelt had initiated this action by signing an HR form in Plaintiff's signature line as Director of NCSS. She also dated the form on a day when she, Coffelt, was away from the office; but Plaintiff was present in her CH office and available to sign the form, should she have approved of taking such disciplinary action.

## PAYNE CONTINUES TO COLLABORATE WITH COFFELT TO UNDERMINE AND USURP PLAINTIFF'S AUTHORITY AS NCSS DIRECTOR

138.    In approximately late April or early May 2022, Payne and Coffelt intentionally and unilaterally attempted to hire a Covid symptom screener into the NCSS Department without consulting Plaintiff. The hiring did not occur because HR reached out to the Plaintiff seeking approval and a signature, but since no screener was needed, Plaintiff did not approve the hiring.

139.    Additionally, without informing Plaintiff, Coffelt worked covertly with Payne in another attempt to hire new staff for screening roles in NCSS, who were not needed.

140.    Then Payne decided with Coffelt that beginning on May 31, 2022, no Covid screeners would be required on Level 1 and Level 4 of the CH building.

141.    Payne and Coffelt willfully and intentionally made plans to eliminate altogether the Covid screening function at CH, and to reassign all the NCSS screeners to Payne's department, effective May 31, 2022.

142.    They did so without the knowledge of Plaintiff, as NCSS Director, nor her permission as Coffelt's supervisor.

143.    Upon learning of this plan on May 25, 2022, Plaintiff instructed Coffelt, both verbally and by follow-up e-mail, to continue the screening process '*as is*' until a plan could be worked out with CAPS staff, who are responsible for the psychological wellbeing of the Cornell students.

144.    Nevertheless, on Friday, May 27, 2022, Coffelt willfully and intentionally sent out a late afternoon email to Dr. Henry, CAA supervisors and others with a plan to eliminate the Covid Screening Function, effective the Tuesday morning, May 31, 2022, right after the Memorial Day Weekend.

145.    This undermining and irresponsible act did not occur only because Dr. Henry acted to alert available CHSS peers still in town who then acted to stop Coffelt's plan.

146.    Additionally, and notwithstanding Plaintiff's clear directive, Coffelt not only ignored that directive, but also later took time off from work without arranging for COVID screener coverage of the First (Level 1) and the Fourth (Level 4) floors of CH when absent.

147.    Coffelt did not inform Plaintiff, nor any of the CAA supervisors (within NCSS), that she had not arranged for coverage for the Friday when she was absent, and nor for the following week.

148.    Indeed, upon her return from her vacation, Coffelt compounded her insubordinate conduct by falsely claiming that no staff were available to work as screeners. Coffelt apparently had not realized that upon discovering Coffelt's insubordination, Plaintiff together with CAA supervisors, arranged for such coverage.

149.    In yet another incident, in late April and early May of 2022, Coffelt attempted to take disciplinary action against a CAA staff member for typing a question into the '*chat*' of a CH forum, hosted by Lombardi; the staff member made an allegation regarding bullying of staff by an unnamed CAA supervisor.

150.    When Coffelt learned that Plaintiff, in her role as NCSS director, had decided to explore the circumstances and frustration apparent in the staff '*chat*' message, Coffelt went to Plaintiff's office to argue that such an investigation was within Coffelt's sole purview, and in which Plaintiff should play no role.

151.    In Plaintiff's subsequent exploration of the staff's allegation of bullying, Plaintiff found that about two thirds of the CAA staff expressed being fearful of retaliation from Coffelt

and another individual, should they dare speak up and raise such issues. Quite the opposite had previously been asserted by Coffelt to Plaintiff.

152.     In a separate matter, during May and June, 2022, Coffelt deliberately and willfully withheld from Plaintiff information and communications pertaining to the temporary assignment of an NCSS CAA staff to the Sports Medicine unit during the summer months, and which was a yearly event. Despite being pulled in by email at least twice by the Plaintiff, Coffelt failed to offer any clarification to the obvious confusion even when a physician in Sports Medicine attempted to write up and submit a change in job description for said CAA to HR.

153.     The job description change should have been handled and submitted by the CAA supervisor or by Coffelt herself, but not by the physician, nor the Plaintiff. When copied by email Coffelt should have reached out to clarify the special annual circumstances to both the physician and to the Plaintiff, but did not do so intentionally.

154.     In July of 2022, Payne and Coffelt colluded to hire a new CAA staff into Plaintiff's NCSS Department, while excluding Plaintiff from the process. Plaintiff had no knowledge of this hire until late in September 2022, after returning from a 2-week vacation.

155.     While rounding on the floors to check in with staff, Plaintiff saw an individual at the Level 3 CAA desk whom she did not recognize, and upon introducing herself to the staff, Plaintiff was surprised to learn that the new person was a CAA hire into her NCSS Department. Then about three weeks later, on October 19, 2022, when Coffelt happened to show up for one of her weekly 1-on-1 meetings, Plaintiff asked Coffelt about the new staff, and Coffelt confirmed she was a new CAA hire into the NCSS Department.

156.     Not having known about the new hire, nor having signed-off on the associated HR forms, Plaintiff asked Coffelt for the supporting e-mails and documents authorizing the new hire. Coffelt then forwarded to the Plaintiff the communications with HR, and without the Plaintiff asking, Coffelt forwarded a document, which showed that Payne was directly involved with the hire. The key email was from Payne, sent to himself, **Christopher M. Payne; UHS-NEWHIRES-L** and others on July 5, 2022, concerning the employee's start date.

157.     Payne had inappropriately acted as though he was the NCSS Director, rather than the Plaintiff, and the supervisor of Coffelt, all the while excluding the Plaintiff, who was present at CH throughout that time. Payne was never similarly involved in such front-line staff hiring in other CH Departments.

## CORNELL'S SHAM INVESTIGATIONS

### *Informal investigation*

158.    In the meantime, rather than having such a discussion with Dr. Henry, regarding her concerns about Payne and his behavior in the previous months, on June 22, 2022, Lombardi asked OIETIX to informally investigate the matter.

159.    This request by Lombardi preempted the more formal Policy 6.4 process where a record is developed followed by a formal report and even steps of accountability and discipline.

160.    Dr. Henry was told by Ciotoli that she would be contacted for an interview and given the opportunity to provide a statement, documents and witness lists.

161.    However, at no time was Dr. Henry ever contacted for any interview connected with this *informal investigation*. It is unclear whether the investigation ever was concluded.

### *OIETIX Investigation of Plaintiff's report/complaint against Payne submitted July 2, 2022*

162.    Having heard nothing, Dr. Henry eventually filed her own report/complaint against Payne. Dr. Henry's 18-page report/complaint describing the biased and discriminatory behavior of Payne was filed with OIETIX on Saturday, July 2, 2022, with a copy sent to Lombardi, her supervisor.

163.    Plaintiff was under the impression that her OIETIX submission would be the key step in initiating a formal and thorough OIETIX investigation into Payne's biased and discriminatory behavior pursuant to policy 6.4 of Cornell's policies and procedures. From what she was previously told by Ciotoli, it would also supersede the *informal investigation* into Payne that had been called for by Lombardi.

164.    As Plaintiff soon discovered, however, the procedure was much more difficult and challenging.

165.    Plaintiff discovered that the critical step to launching such an investigation would be the drafting of a *formal complaint document* by an assigned OIETIX Investigator (typically an attorney). Should Plaintiff agree to the content, Plaintiff would sign it and a formal and thorough investigation was supposed to be conducted.

166.    OIETIX assigned Nasser Siadat, Esq. ("Siadat") as the Investigator for Plaintiff's July 2, 2022 OIETIX report against Payne. At the time and in the months thereafter Plaintiff was ***not*** told that Siadat had also been assigned to conduct the informal investigation.

167.    Generating a signable formal complaint document proved highly problematic.

168.     Sometime after July 2, 2022, Siadat drafted a bare bones and weak proposed complaint that substantively omitted most of the underlying bases for Dr. Henry's complaint of racial bias against Payne, which she had included in her initial OIETIX filling.  Siadat's draft also contained factual errors.

169.     On the morning of July 21, 2022, Siadat provided his draft version of the proposed formal complaint to Dr. Henry for signing.  Dr. Henry, however, immediately noticed these glaring omissions, and factual errors that were at variance with Henry's July 2, 2022, submission. Siadat's version included language that changed the focus of her OIETIX filing, continued to omit many other key elements of her filing, and included versions of facts that Henry believes originated with Payne, Varma or both.

170.     Despite pressure from Siadat, Dr. Henry made clear to him that she could not and would not sign Siadat's draft since it had inaccurate language and false statements and even elements based on some other source.

171.     Later that day, Dr. Henry redrafted Siadat's proposed document, making it truthful and consistent with her July 2, 2022, submission; she forwarded her draft to Siadat that day.

172.     Thereafter, on the evening of July 21, 2022, Siadat rejected Plaintiff's draft version in an email and subsequent emails that reflected anger, belligerence, and a lack of respect.

173.     Plaintiff was shocked by the tone and content of Siadat's response and forwarded the email string to Siadat's supervisor at OIETIX.  A few days later, Siadat was removed as investigator on the claim; although, Plaintiff was not advised of this development until August 3, 2022.

174.     In the meantime, on August 2, 2022, Dr. Henry filed a complaint against Coffelt with OIETIX.

175.     Then on August 3, 2022, OIETIX advised her that Siadat would no longer be working on the Payne case, and that a new Investigator, yet unnamed, would be assigned to both the case against Payne and the new one against Coffelt.

### *Investigator Pari Le Golchehreh from Grand River Solutions Assigned by OIETIX*

176.     On August 18, 2022, Plaintiff received an email from Cooper Sirwatka of OIETIX, stating in part

> *We've selected an external investigator who has been provided with all the documents and information Nasser had collected; she's currently reviewing all of*

*the documents. I'm meeting with her tomorrow afternoon and will have a more detailed update to share with you after that meeting.*

177.    Then on August 23, 2022, Plaintiff received another email from Sirwatka, stating in part:

*Pari Le Golchehreh from Grand River Solutions will be handling the investigation of your complaint. …. I believe that she intends on meeting with you in the next couple of weeks and will be in touch to arrange that.*

178.    Pari Le Golchehreh ("Pari"), reached out on August 25, 2022, to offer possible meeting times, but it became clear that she had only been assigned to the complaint against Payne. A few weeks later Pari was assigned to the complaint against Coffelt as well.

179.    By this time, it was clear that Cornell was dragging its feet and creating obstacles to any fair adjudication of Dr. Henry's claims. Accordingly, on August 25, 2022, Dr. Henry filed a complaint with the EEOC against Cornell.

180.    The EEOC complaint was known to OIETIX and to Pari.

181.    Nevertheless, Dr. Henry thought that Pari would be independent in her investigation of the complaints and continued to cooperate with her. However, it soon became clear that OIETIX was insisting that Pari use Siadat's specific and inaccurate language in the drafting a formal complaint, and that Pari was not allowed to "start from scratch" in developing the complaints. Most troubling, Pari explained that she would need "to get permission" from OIETIX in order to exercise such independence in her investigation.

182.    Upon information and belief, it is respectfully submitted that the true mission of Cornell and its OIETIX was not to objectively seek truth or justice for Dr. Henry regarding the actions of Payne and Coffelt, but rather to shield Cornell as an institution.

183.    On or about November 8, 2022, Cornell and OIETIX abruptly suspended Pari's investigation of both the Payne and Coffelt cases; Pari had not yet completed the complaints and had not conducted any investigation other than reviewing Siadat's work product and having two or three video conversations with Dr. Henry.

### Coffelt's false grievance against Dr. Henry in early July of 2022

184.    Unbeknownst to Dr. Henry, on July 6, 2022 Coffelt had filed a grievance against Henry pursuant to 6.11.4.

185.    As it turned out, the underlying basis for the grievance was a false claim by Coffelt to the effect that Dr. Henry had put nurses' licenses at risk by encouraging the breaking of established rules of nursing practice at CH. This was demonstrably false in several respects and easily could have been proven so through investigation.

186.    Dr. Henry did not learn of the substance and disposition of the grievance until well after she had been terminated by Cornell. However, she was told by Lombardi that a grievance had been filed by Coffelt at a meeting with Lombardi on August 3, 2022.

187.    Upon information and belief, Coffelt's grievance was heard by Ciotoli as agent for Lombardi on August 23, 2022 and was subsequently denied.

188.    However, in her written denial of the grievance, dated August 30, 2022, Ciotoli told Coffelt that the allegation with respect to putting nursing licenses at risk would be addressed with a "clinical investigation" involving an interview of other employees and Dr. Henry, and subsequent report to and review by Lombardi.

189.    Upon information and belief, no such investigation ever happened; Dr. Henry was never interviewed or even notified of any such investigation.

190.    Importantly, Ciotoli's statement that such a clinical investigation (of Dr. Henry) would happen, occurred five days after Henry had served and filed her EEOC charge of discrimination on August 25, 2022.

191.    And, Lombardi later used Coffelt's false allegation and the sham "clinical investigation" that never happened as a pretextual basis for terminating Dr. Henry.

192.    Lombardi also cited Coffelt's false accusations and the secretive and phony '*investigation*' as a pretext for carrying out what was claimed to be a restructuring of CH clinical operations in mid to late September of 2022, as described in more detail below.  However, this reorganization proved to be a complete sham, and a clear act of retaliation against the Plaintiff.

## **LOMBARDI RETALIATES AGAINST DR. HENRY**

193.    On Tuesday June 28, 2022, Plaintiff provided her supervisor, Lombardi, with the completed portion of her Performance Dialogue (PD), an annual performance review conducted for each staff member following Cornell Policy 6.10.6, *Performance Dialogue*.

194.    According to this Cornell PD policy Lombardi, as Plaintiff's supervisor, would then add his own comments, and a meeting would be scheduled with Plaintiff to discuss her PD document and to provide constructive feedback.

195.    In writing her PD contribution, guided by many specific questions in the PD template, Plaintiff discussed her many accomplishments as Director of NCSS, as well her plans for the NCSS and her own professional growth in the upcoming year.

196.    In answering specific questions in the PD template, Plaintiff also discussed the challenges she faced in supervising Coffelt and dealing with her persistent insubordination and acts of disrespect; she also discussed her negative experiences in interacting with Payne.

197.    Essentially, she was using the PD forum and Q&A template to reach out to her supervisor, Lombardi for help in navigating these difficulties. She had no way of knowing the extent to which Lombardi was aware of these issues, as Lombardi had never reached out to her or met with her 1-on-1 since February 22, 2022, when such issues were not discussed.

198.    On Friday, July 1, 2022, Lombardi acknowledged receipt of Plaintiff's written PD portion, and a meeting was scheduled for July 27, 2022, to discuss her PD after he completed his portion.

199.    Then on Wednesday July 6, 2022, Lombardi abruptly canceled his PD meeting with Plaintiff, and it was never rescheduled.

200.    Coincidental to Lombardi's abrupt cancellation of the PD meeting, and unbeknownst to Plaintiff, Coffelt had filed a grievance against the Plaintiff that same day.

201.    Also, by then Lombardi would have received his courtesy copy of Plaintiff's OIETIX complaint against Payne that she had filed on Saturday, July 2, 2022.

202.    Plaintiff's OIETIX report/complaint against Payne also named Coffelt as having collaborated with Payne in his violations of Cornell Policy 6.4.

203.    Lombardi never rescheduled his meeting with Dr. Henry to discuss Henry's PD.

204.    However, on or about July 20, 2022, Dr. Henry completed her supervisor's portion of Coffelt's PD document. Since Henry had evaluated Coffelt's PD performance as being *'unsuccessful'*, Henry followed protocol and provided an information copy to Lombardi.

205.    The next day, on Thursday July 21, 2022, Lombardi abruptly instructed Plaintiff not to proceed with Coffelt's PD meeting until Varma's return from vacation at which time he, Varma and Plaintiff could discuss it.

206.    On July 26, 2022, Lombardi scheduled a 45-minute meeting to be held in his office on August 3, 2022 at 10:00 am, involving Plaintiff, Lombardi and Varma. The meeting subject was *"Cornell Health Discussion w/Ryan, Shan & Marie."*

207.    Being concerned about the lack of any follow up with Plaintiff by either Lombardi or Varma to address Coffelt's behavior, and having been instructed by Lombardi to not proceed with Coffelt's PD meeting, Plaintiff reasonably believed that she had no choice but to submit to OIETIX a complaint/report against Coffelt in order to address Coffelt's discriminatory and racially biased behavior against Plaintiff over the previous 12 months.

208.    August 2, 2022, the day before the scheduled meeting with Lombardi and Varma, Plaintiff submitted to OIETIX her report/complaint against Coffelt.

209.    At the beginning of the 10:00 am meeting on August 3, 2022, and before Varma entered the room, Plaintiff immediately told Lombardi that she had filed a report/complaint against Coffelt with OIETIX the previous day.

210.    At that point Lombardi said in a quiet tone, "*This changes everything!*", without explaining what he meant by "*everything*."

211.    The August 3, 2022 meeting was scheduled for 45 minutes. Nothing discussed aligned with the meeting purpose: *"Cornell Health Discussion w/Ryan, Shan & Marie."*

212.    Instead, it was clear that Lombardi and Varma simply wanted to formally advise Dr. Henry of the grievance complaint that Coffelt had filed against Henry (without providing any information about its substance) as noted above, or worse. Indeed, Varma handed Plaintiff a copy of Cornell Policy 6.11.4, *Staff Complaint and Grievance Procedure*, which he had carried in with him to the meeting.

213.    After the meeting, and although Varma had promised to contact Dr. Henry within 10 days about Coffelt's grievance, neither Varma nor anyone else ever contacted Dr. Henry about that grievance. Also as noted above, Dr. Henry only learned of the substance and disposition of that grievance during the EEOC proceedings in December 2023.

## PLAINTIFF FILES EEOC COMPLAINT

214.    On Thursday, August 25, 2022, Plaintiff filed a Charge of Discrimination with the EEOC (hereinafter "Charge") against Cornell (EEOC #: 525-2022-02340).

215.    On that same day, a courtesy copy of the complaint was provided to Donica Varner, Esq., Cornell Office of Legal Counsel.

216.    The substance of the complaint was race-based discrimination and retaliation, supported by the many detailed incidents of racism and retaliation that had occurred since Dr. Henry has started at Cornell in July 2021, including some of the incidents referred to in this complaint.

## MORE RETALIATION BY LOMBARDI AND OTHERS AT CORNELL

217.    Almost immediately, Payne lashed out at Dr. Henry. In this regard, at a previous CHSS meeting, Henry had made a legitimate request for additional LPN/CMA staffing support because of challenges arising out of the upcoming Point-of-Care (POC) testing. After the EEOC

27

complaint had been filed, Payne responded by email addressed to Henry, cc to Varma. The email was belligerent and bullying.

218.    In contrast, in two previous CHSS meetings, Payne was receptive to similar staffing requests from two White female peers, and even advocated to Lombardi for their approval.

219.    Payne's behavior reflected bias, bullying, and targeting of Plaintiff, a Black female, and in retaliation for her opposition to racist discrimination.

220.    Varma, in receipt of this aggressive email did nothing to support the Plaintiff and to defend her right to ask such questions as the Director of NCSS.

221.    Notwithstanding the previously alluded to public forum in the Summer 2022 involving NCSS staff (where the staff expressly stated its consensus of general support for Dr. Henry and her work in NCSS), Lombardi called Dr. Henry to a meeting on September 19, 2022. At that meeting, Lombardi claimed that he had a plan to restructure CH in a way that advanced Hamilton into a larger leadership/oversight role in the clinical areas within CH (Medicine, NCSS, CAPS, and Occupational Medicine).

222.    Hamilton's new title would be *'Interim Chief of Clinical Operations and Services'* and she would become Plaintiff's new supervisor, and ostensibly the supervisor of the Senior Clinical Leadership peers of Plaintiff.  Hamilton would also remain as Director of the Department of Medicine, where in that role she was previously Plaintiff's peer at CH.

223.    In the meeting, Lombardi offered several reasons for this restructuring, one being that the departure of AVP McMullen in early January of 2022 meant that CH had no unit leader. Also, the position of Director of the CAPS was vacant as was the position of Director of the Occupational Medicine.

224.    A reason also mentioned by Lombardi, was that he wanted to '*reduce risk*' in the clinical areas, but did not elaborate.

225.    Plaintiff asked when, how and by whom Plaintiff's unfinished Performance Dialogue (PD) would be completed. Lombardi did not answer the questions, except evasively.

226.    Both at that meeting and subsequently, Lombardi continued to claim that Hamilton indeed was being promoted (temporarily) to an overarching role as Interim Chief, supervising all clinical areas within CH, including Dr. Henry and the Clinical Senior Staff peers of Dr. Henry.

227.    As it turned out, that simply was not true. What Lombardi told Dr. Henry was not what he had told Hamilton. Tellingly, within days following the meeting Lombardi sent an email to Hamilton that said:

*"I had the chance to talk with Marie on Monday, and that went fine. She thinks you're terrific!"*

228.    Moreover, Payne also continued his retaliation. In this regard on September 19, 2022, Dr. Henry discovered that Payne had submitted two false and denigrating reports to Lombardi regarding the Plaintiff and her NCSS department, one on that day and covering the previous week and the other on September 12 covering the week before. These false reports were also disseminated to CHSS.

229.    In these reports, Payne claimed to have uncovered issues within NCSS regarding the ordering of vaccines and keeping inventory.  In fact, most of the inventory issues raised by Payne already were being handled by Plaintiff and her staff, and were due to failures in the PnC system, which was the responsibility of Payne's Administrative Services Department.

230.    These issues had existed for at least two years, as per several staff in NCSS, and predated Plaintiff's time at CH.

231.    Nevertheless, to deflect responsibility for his own culpability, Payne spread these false narratives against the Plaintiff.

232.    It is unclear whether these false reports by Payne, or the false grievance allegations by Coffelt, were connected to Lombardi's reference to '*reducing risk*' during his conversation with Dr. Henry on September 19, 2022. Either way, Lombardi's so called reorganization plan simply was a pretext to set up and terminate Dr. Henry in retaliation for her opposition to the racist discrimination perpetrated against her at Cornell.

## HAMILTON'S NEW ROLE WAS A SHAM

233.    Lombardi's so-called new organizational plan and Hamilton's new role in connection therewith was a sham. It perpetuated the cynically racist "house negro" trope whereby a White boss used a Black subordinate to discipline/fire another Black subordinate.

234.    Hamilton was and is a Black woman.

235.    Cornell's assignment of a Black woman to supervise Plaintiff, another Black woman, was a blatantly racist effort to insulate from legal scrutiny Cornell's cynical pretextual activities leading to the retaliatory termination of Plaintiff.

236.    Sadly, Cornell's own Black leadership is aware of this pernicious practice.  At a noon seminar given on Monday, February 20, 2023, referenced as *The Inclusive Wellness Series with Dr. Gail Christopher*, and under Cornell's Office of Diversity and Inclusion, Dr. Christopher pointed out that this Black-on-Black practice traced back to the days of slavery.  In a follow-up seminar on campus in May 2023 that was set up to provide guidance and support for black female administrators and staff in mid-level leadership positions, to help them navigate the

special challenges they faced as Black women, one Cornell Senior Leader boldly commented with an air of disapproval and disgust, and to widespread agreement:

### *'They put black people over black people in order to fire them!'*

237.    In April 2023, Hamilton finally admitted that the true and only purpose of her reappointment was to supervise Dr. Henry.

238.    Indeed, beginning as early as October 2022, the emerging (sham) role of Hamilton was not as had been conveyed by Cornell and Lombardi.

239.    Hamilton had not seen or had been briefed on Plaintiff's two OIETIX reports/complaints against Payne and Coffelt, nor Plaintiff's EEOC filing of August 25, 2022.

240.    Hamilton seemed to know little, if anything, about the issues Plaintiff had experienced with Payne and Coffelt, and seemingly did not care.

241.    At one point, Hamilton was questioned regarding her potential role in being a mediator, for instance in meetings between the Plaintiff and Payne, to which Hamilton responded, in substance, that '*They can't pay me for that.'*

242.    By then, Plaintiff realized that Cornell's encouragement of her to work with Hamilton was a sham and the so-called restructuring of CH whereby Plaintiff, NCSS, and other clinical units at CH were placed under of Hamilton's supervision, was also proving to be a sham.

243.    This deception was reinforced months later, when Plaintiff learned that, already at the time of Hamilton's appointment as Plaintiff's Black supervisor in the Fall 2022, Cornell had developed a severance package to be offered to the Plaintiff at some point.

244.    The simple truth is/was that Dr. Henry ultimately was the only employee who was subject to the so-called restructuring of CH. She was the only member of CH Senior Staff who was subjected to such supervision by Hamilton, and no longer directly reporting to Lombardi. In fact, Plaintiff appeared to be assigned to an otherwise nonexistent department at CH, called 'COS', as its sole member; no other CH employees were assigned to that department.

245.    The sham nature of this reorganization plan under Hamilton as *Interim Chief of Clinical Operations and Services* became increasingly clear in the months to follow.

246.    Hamilton confirmed the same in her own words in a conversation she had with Dr. Henry on April 19, 2023.

247.    When pressed about her true role and purpose regarding the supervision of Plaintiff and NCSS, the relevant discussion went as follows:

**Marie** 13:00
*Week two, you said, after taking over and you're supposed to be assessing the department.*

**Jada** 13:10
*What week two, what week two?*

**Marie** 13:10
*Week two. Week two after taking over.*

[This was in reference to the second week after September 27, 2022, when Hamilton assumed her new role as '*Interim Chief of Clinical Operations and Services*' and became Plaintiff's new supervisor.]

**Jada** 13:10
*After taking over? After taking over what?*

**Marie** 13:15
*What do you mean, what? What did you take over? Aren't you supervising NCSS?*

**Jada** 13:20
***No, I am supervising you. I'm not supervising NCSS.***

**Marie** 13:23
*So why are you meeting with the staff? They're NCSS? Because you're over NCSS?*

**Jada** 13:29
***No, I'm not over NCSS.***

**Marie** 13:31
*So why are you meeting with the staff then?*

**Jada** 13:35
*What staff am I meeting with?*

**Marie** 13:36
*NCSS, my staff, my leadership staff and telling me all these things,*

**Jada** 13:41
*You mean the nurse managers?*
*….*
**Jada** 30:13
***You know, Marie, I have no clue what's happening in your department. I don't care****.*
*….*
**Marie** 44:15
*Why were you doing it again?*

**Jada** 44:17
*Doing what?*

**Marie** 44:18
*What you're doing?*

**Jada** 44:20

*Because Ryan [Lombardi] asked me to and asked if I would step -- would help out. I said, of course.*

**Marie** 44:24
*And what, what was the goal?*
*….*

248.    Because Hamilton's role was a subterfuge and clearly more limited than as Lombardi had announced, other efforts at Cornell primarily by Payne, Coffelt and Varma to undermine and create a false narrative regarding Dr. Henry went unchecked and were condoned by Cornell, and appeared to have been intended to get Dr. Henry to resign.

249.    Often, Hamilton engaged directly with and sided with these miscreants in the underlying discrimination and harassments incidents.

250.    As Plaintiff's supervisor, Hamilton engaged in her own pattern of undermining Plaintiff by cutting Plaintiff out of management and senior-level decisions with no explanation, and otherwise harassing the Plaintiff in support of Coffelt, Payne and others, including the following examples:

    a.   On October 11, 2022, Payne sent an email to Plaintiff regarding a fire drill that had recently been carried out accusing her of jeopardizing staff safety by having given improper instructions. As it turned out, the accusation was false and unfounded. Nevertheless, Hamilton determined it was not racially motivated.

    b.   In October 2022, Plaintiff was not included in a number of emails by and including Payne and Hamilton, and others, concerning an important NCSS matter, notwithstanding that she had left explicit instructions to be included in such emails while she was away.

    c.   In November 2022 and continuing almost weekly thereafter, Hamilton falsely stated that Dr. Henry's nurse managers wanted to be relieved of certain meetings and other tasks; when asked, the nurse managers not only denied the accuracy of that claim but actually confirmed that they valued the meetings. Apparently, the sources of Hamilton's false information were Payne and Coffelt. Although later Hamilton grudgingly conceded the existence of undermining and discrimination by Payne and Coffelt, she declined to step in to support the Plaintiff.

    d.   On December 7, 2022, Hamilton, through email, engaged one of Plaintiff's nurse managers in a discussion regarding policy that Hamilton had discussed with Payne, and which impacted the workflow of NCSS. The email was not copied to Dr. Henry. The Nurse Manager realized immediately that Hamilton's exclusion of Dr. Henry was inappropriate, and in responding included Plaintiff, her supervisor, in the email thread.

    e.   In January 2023, Hamilton set up a meeting involving Dr. Henry, Coffelt and herself ostensibly to promote a "reset" between Coffelt and Henry, although the meeting happened, Coffelt made clear that she had no intention of cooperating with Henry going forward, and Hamilton did nothing to dissuade her.

f.  Thereafter, Coffelt refused to cooperate with Dr. Henry with respect to the workflow of the CAAs; when Henry gave instructions to Coffelt in connection with such issues (e.g. scheduling of CAAs in snowstorms and other crises), Coffelt was belligerent, insubordinate and disrespectful. When Henry showed Hamilton the clear email evidence and documentation of Coffelt's bad behavior, Hamilton at first supported Henry but then would flip flop and take Coffelt's side.

g.  In another incident, Coffelt falsely accused a staff member of an offense and proposed severe discipline. Dr. Henry, upon review, determined that the accusation was not true and such discipline was not warranted. At first Hamilton supported Henry but then did an about face, telling her "let her (Coffelt) do whatever she wants!"

h.  Dr. Henry and her Nurse Managers had advocated for and initially verbally received extensions of two RN contracts. In early March 2023, Payne and Hamilton rescinded the approval and Dr. Henry and a Nurse Manager had to inform the RNs that their contract was up at the end of the month. Then, without any further consultation with or involvement of Henry, one of the positions was reinstated by Hamilton and Payne, and the RN was notified directly. This created an embarrassment for Henry who was excluded and unaware.

i.  Another example is an incident involving *AccessNurse*. In mid-April 2023, Payne blamed Dr. Henry, publicly in a CHSS meeting, for a breakdown in communication regarding application of a policy for handling after-hours calls to CH for medical services – all prompted by a student calling in to report suspected suicidal ideation by another student. Payne had not realized that Hamilton was the person responsible for this breakdown. It turned out that Hamilton had been excluding Dr. Henry from all discussions, emails and meetings involving *AccessNurse.*

j.  On May 4, 2023, Hamilton and Payne insisted on assigning a performance bonus to Coffelt over the objection of Dr. Henry, as Coffelt's supervisor and NCSS department director. Hamilton's insistence began after she reportedly received a written communication from Payne to the effect that Payne's staff thought that Coffelt should receive a performance bonus. Henry did not support such a bonus due to ongoing conduct and insubordination issues Coffelt exhibited; Hamilton pressured Henry to relent, but eventually agreed to a discussion of the issue generally among CHSS. At that meeting, Henry provided a chain of recent insubordinate and '*rude*' emails that Coffelt had sent to Henry, and which were also in Hamilton's and Varma's possession. Furthermore, she pointed out that when Dr. Henry had asked Coffelt to make recommendations for performance bonuses for her group, Coffelt had proceeded self-servingly to select only herself and one other staff with whom she aligned (and whom numerous staff felt was punitive in her leadership style) and had also provided her *self-selection* document to Hamilton directly. In response, Payne ominously threatened that he, Hamilton and Varma of HR would be meeting with Henry in a few days to further discuss the issue. Nevertheless, Henry stood her ground as a matter of principle in providing leadership at Cornell Health. Sadly, instead of supporting Henry,

Hamilton cowered in the face of Payne's onslaught, and aggressively told Henry that she should award the bonus.

251.     By any reasonable measure it appeared that Hamilton knew that her role was to focus on Dr. Henry alone and to lay the groundwork for an eventual termination that would survive legal scrutiny. Indeed, in April 2023 Hamilton let slip to Dr. Henry that a termination letter already had been prepared by Cornell as early as January 2023.

## NATIONAL SEARCH FOR EXECUTIVE DIRECTOR OF CH CONFIRMS PLAINTIFF'S QUALIFICATIONS AS WELL AS LOMBARDI'S BIAS

252.     In January of 2023, Lombardi announced that a national search would take place for an Executive Director (ED) for CH as a replacement for AVP McMullen. It would occur under the guidance of an executive search firm, ***Keeling and Associates,*** and the qualifications and requirements of the position were advertised in the national media. All applications were to be sent to Keeling and Associates for screening, after which the files of viable and qualified candidates would be sent to the Cornell Screening Committee, which upon their review would select three finalists.

253.     Shortly after the announcement, in the first meeting of CHSS staff in which the search was to be discussed, ***Payne boldly announced that he would be a candidate for the ED position***, and therefore would recuse himself from any further internal CHSS discussions of the search.

254.     Shortly thereafter, in early February 2023, Plaintiff applied for the ED position, submitting her cover letter and CV to the search firm, Keeling and Associates.

255.     After reviewing Plaintiff's application, and interviewing her in a 1-hour call, Keeling and Associates staff forwarded Plaintiff's application to Cornell as a candidate who was qualified for the ED position and should be considered.

256.     On March 14, 2023, Plaintiff's had a phone debriefing from Shadia Sachedina (EdD) of Keeling and Associates, regarding the outcome of her application. Plaintiff was told that her application for Executive Director of CH was not moved forward by the Cornell ED Screening Committee, but three candidates from outside Cornell were being moved forward to be interviewed at Cornell.

257.     While disappointing to the Plaintiff at the time, this decision did not come as a surprise since she had learned that both Hamilton and Lombardi happened to be among the members of the Cornell ED Screening Committee.

258.     Nonetheless, there were many positive and encouraging comments relayed to the Plaintiff by the Screening Committee. See earlier discussion.

259.     In her debriefing of the Plaintiff, Ms. Sachedina said that the Plaintiff's application was well-received by the Screening Committee; however, she was not selected to be one of the three finalists as the competition was extremely stiff and Plaintiff had only been at Cornell and in a College-Health environment for about 18 months.

260.     Of the three finalists, one withdrew and neither of the other two was selected.  It was a failed search.

261.     Then, in a revealing turn of events, in April 2023, Lombardi wrote a letter to the Cornell Health staff stating, in part:

> *The screening committee met to discuss the search and status of candidates and has decided to advance an additional candidate for a campus interview.*
>
> ***Chris Payne, Senior Director for Cornell Health, will interview for the Executive Director position next week.*** *While we initially prioritized candidates who were practicing clinicians, we feel that Chris' extensive experience in college health makes him well suited for consideration at this time.*
>
> ***It is important for me to share with you that Chris was unaware of the decision to advance his candidacy until very recently****.*

262.     Of critical significance,  Lombardi was knowingly and consciously promoting Payne, an unqualified White male who had not met  the minimum qualifications for the Executive Director role and job description that Cornell had published in launching the national search, over Plaintiff, a qualified Black female who not only had met the minimum qualifications for the Executive Director role and job description but also had been successfully screened and advanced by the outside search firm.

263.     Eventually on Friday, May 26, 2023, Lombardi announced, with an expression of regret, that Payne was not chosen as the next Executive Director of Cornell Health.

264.     Six days later, on Thursday, June 1, 2023, the Plaintiff was abruptly terminated and fired from her position at Cornell Health.

## THE OIETIX INVESTIGATIONS ARE CLOSED OUT

265.     In the meantime, on March 2, 2023, *almost four months* after the OIETIX investigative process had been suspended, OIETIX issued a "***Notice of Initial Assessment***" to Plaintiff which stated in part:

> *While a number of concerns were raised in your reports, they do not fall within Policy 6.4 as there is not sufficient evidence to support that any materially adverse employment actions were taken against you based upon your membership in an Equal Education and Employment Opportunity ("EEEO")-protected class.*

*Because there was no supervisory relationship between yourself and Christopher Payne or Kristi Coffelt, they had no authority to make decisions regarding your employment (pay, work assignments, discipline, etc.).*

*Also, there is an absence of any other positional power differential between the employees. No evidence further exists to support any kind of informal power differential.*

*There are no facts that Cornell Health management indirectly gave either Payne or Coffelt decision making authority nor did an environment exists in which they had such a degree of influence to be considered to have de-facto power over you.*

*Although there was not sufficient evidence to support a Policy 6.4 violation, the concerns about the workplace climate have been communicated to Human Resources. As you can appreciate, matters such as these are kept to those who need to know to maintain parties' confidentiality.*

*Any personnel action taken by the University that require/recommend corrective measures would only be shared with the effected individual so that we are able to maintain a respectful work environment. For further follow up on these issues, I would recommend that you connect with Shan Varma in the Office of Human Resources.*

*If you have additional evidence of discrimination that you believe was not adequately considered as part of this inquiry, please feel free to reach out and we will evaluate reopening the matter.*

266.    The resumption of the previously suspended OIETIX investigations occurred without any notice to, or the involvement of Dr. Henry.  Dr. Henry had not been interviewed; she had not been asked for, and therefore had not provided, any list of witnesses or supporting documents. Upon information and belief, Pari had not conducted any interviews or other investigation, and was not involved in this determination.

267.    When Dr. Henry raised these concerns with OIETIX following her receipt of the Notice of Initial Assessment, OIETIX promised to get back to her, but never did.

268.    However, OIETIX had included in its Notice an invitation to submit additional evidence in support of re-opening the claims.

269.    Accordingly, on May 8, 2023, Plaintiff submitted to OIETIX additional materials and information that documented the ongoing racism and retaliation over the 10 months since the original filing.  In this resubmission Plaintiff also named Hamilton and Coffelt as collaborators with Payne in the discriminatory and retaliatory actions.

270.    Although OIETIX confirmed receipt of Plaintiff's submission and promised to contact Plaintiff in 3 to 5 days, that never happened.

271.     Moreover, on May 31, 2023, Plaintiff submitted to the EEOC a Rebuttal to Cornell's Position Statement on Plaintiff's EEOC Charge of Discrimination.  This Rebuttal raised some of the same issues.

272.     Cornell's response to one or both of these filings was to retaliate against the Plaintiff the next day; On June 1, 2023, Plaintiff was abruptly fired from her position as Director of NCSS at Cornell Health and forced to leave Cornell University.

## HAMILTON'S CHARADE CONTINUES: "GOAL ALIGNMENT"

273.     In late March 2023, Hamilton presented Dr. Henry with a so-called ***Goal Alignment*** document together with a ***PnC checklist***.  Upon information and belief, Varma assisted Hamilton in crafting this document and related strategy.

274.     This *Goal Alignment* document included a list of tasks for Plaintiff to complete by the end of the Spring semester 2023.  All but one of the additional tasks listed in the *Goal Alignment* document were routine tasks that already were being carried out by the Plaintiff since early Fall 2021. The last additional task was a project that Plaintiff already was working on and was quickly completed.

275.     The most significant of the two documents was a *PnC checklist*, that had just been given to Plaintiff about two days earlier. This was a long PnC training document for clinicians that Plaintiff had never seen before. Although the checklist had been in existence at CH since 2013, it had never been provided – or even mentioned – to the Plaintiff before.

276.     One of the goals in the *Goal Alignment* document was for Plaintiff to become proficient in PnC following tasks in the extensive *PnC checklist*, and to do so by the upcoming end of the semester in two months

277.     Dr. Henry was happy to finally be given the opportunity to finally learn and become proficient in *PnC*, which had been denied her previously by Payne and Hamilton, but had not been denied her White peers (including the more recent hire Reetz).

278.     Upon information and belief, the true purpose of the task was to try to set up Dr. Henry for failure by exposing her shortcomings in PnC proficiency.  Plaintiff was now being given a very limited timeline to show proficiency in the PnC document's long list of tasks, while doing her regular job as well.

279.     Despite the Goal Alignment's tight deadline for PnC training, and the long-standing delay tactics on the part of Hamilton and Payne in assigning a trainer or tutor, Dr. Henry obtained training assistance essentially on her own, and was able to complete the most critical PnC tasks before she was terminated on June 1 of 2023; the few tasks that remained had to await the return of the trainer who was dealing with a sudden family illness.

280.     Of note, when Dr. Henry had asked several times for help from Hamilton, a practicing clinician, regarding how to do certain PnC tasks, Hamilton could not provide answers or assistance; and she did not ever follow through with her promises to get the answers or assistance.

281.     Moreover, Hamilton was well aware of the long history of Payne's refusal to provide the PnC training to Dr. Henry. Hamilton was in attendance at an August 2021 meeting when Dr. Henry asked (even dramatically pleaded to the point of becoming emotional), for Payne to arrange for training in PnC software.  Then, more than a year later, in early October 2022, Henry reiterated to Hamilton that she still needed proper PnC training.

282.     Suddenly, on March 22, 2023, Hamilton produced a multi-page, long-existing PnC training document, that had never been provided to Plaintiff during the previous 22 months.

283.     The late production of the *PnC checklist,* as a clinicians' training document, together with the accompanying, *Goal Alignment* document and related short deadlines, in the context of the events at issue, were part of Cornell's retaliatory and pretextual scheme to terminate Plaintiff.

284.     This **Goal Alignment** document and narrative it attempted to create was a sham and a shameless effort by Cornell to create a false narrative regarding Plaintiff's "*shortcomings*" which Cornell hoped to use as a basis for her termination by Cornell on June l, 2023. However, Plaintiff was successful in fulfilling the original Goal Alignment tasks, some even introduced at later times. Plaintiff completed her PnC training, except for a few remaining tasks delayed in late May by an untimely illness in the trainer's family.

285.      Nevertheless, given the circumstances, Plaintiff had to respond firmly, even forcefully, to Hamilton to expose the false narrative that the Goal Alignment Document was attempting to fabricate.

286.     Dr. Henry's quiet and effective persistence in performing her job did not sit well with Hamilton, who had expected to be more successful in her effort to undermine and to discourage Henry.  This led to various outbursts that revealed the true mission assigned to Hamilton by Lombardi and others.

287.     In late April or early May, when Dr. Henry asked Hamilton about her apparent lack of support, and even undermining, of Henry, citing many of the examples set forth in this complaint, Hamilton blurted out something to the effect '*This is what I get for doing someone a favor!*' The '*someone*' was Lombardi.

288.     Cornell, nonetheless, attempted to rely on the baseless claims associated with the Goal Alignment, and other pretexts associated with Hamilton's interference, harassment and undermining of the Plaintiff, to fire Plaintiff on June 1, 2023.

## CORNELL FIRES DR. HENRY

289.    By letter dated and delivered to Dr. Henry on June 1, 2023, Cornell fired her effective immediately.

290.    Plaintiff timely appealed the termination internally at Cornell.  All such appeals and grievances were denied.

291.    Plaintiff exhausted all administrative remedies.

## PLAINTIFF FILES A SECOND EEOC COMPLAINT

292.    On August 25, 2023, Dr. Henry timely filed a second complaint against Cornell with the EEOC.  The claim alleges race-based Discrimination and Charge of Retaliation. (EEOC #525-2023-02234).

293.    This second complaint referenced the first complaint and set forth the ongoing racism and retaliation at Cornell, including the details set forth in this Complaint.

294.    As set forth above, the EEOC issued Notices of Right to Sue for both claims on July 9, 2024 and July 11, 2024 respectively.

## AS AND FOR THE FIRST CAUSE OF ACTION AGAINST CORNELL
### *HOSTILE WORK ENVIRONMENT ON ACCOUNT OF RACE UNDER TITLE VII (42 U.S.C. § 2000e-2, et seq.)*

295.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

296.    Plaintiff is a Black female and identifiable as such.  Accordingly, Plaintiff is in a class of persons protected under 42 U.S.C. § 2000e, *et seq.*

297.    At all times pertinent herein, Cornell is an employer as defined in Title VII of the Civil Rights Act (42 U.S.C. § 2000e).

298.    At all times pertinent herein, and as detailed above, Plaintiff was continually harassed on the basis of her race while employed by Cornell. This harassment was unwelcome by Plaintiff.

299.    At all times pertinent herein, Cornell tolerated, condoned, and/or participated in the above-described actions and omissions against Plaintiff because she is a Black woman, and a member of a protected class.

300. Further, as a result of the foregoing, Cornell created a hostile work environment that was permeated with discriminatory intimidation, ridicule and insult; it was intimidating, offensive and abusive to reasonable people because of the severe and pervasive discrimination Plaintiff endured.

301. Plaintiff perceived the environment to be abusive, hostile, and offensive.

302. As a result of the foregoing, Cornell condoned the harassment and hostile work environment on the basis of her race by failing to investigate Plaintiff's complaints and prevent discrimination, inadequately investigating the harassing allegations launched against Plaintiff, creating and/or adopting sham pretexts for acting against Plaintiff, and ultimately terminating Plaintiff.

303. All alleged incidents are sufficiently related in nature and severity and are part of the same hostile work environment practice.

304. As a result of the foregoing, Cornell otherwise engaged in unlawful practices as defined in Title VII.

305. As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

306. As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

307. As a result of the foregoing, punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

308. Under Title VII, Plaintiff is entitled to an award of attorneys' fees and costs, including but not limited to expert witness fees.


**AS AND FOR THE SECOND CAUSE OF ACTION AGAINST CORNELL**
*HOSTILE WORK ENVIRONMENT ON ACCOUNT OF RACE UNDER NEW YORK STATE EXECUTIVE LAW § 296*

309. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

310.    Cornell is an employer within the meaning of New York State Executive Law § 292.

311.    New York State Executive Law § 296(1)(a) provides that: It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, color, religion, military status, sex, disability, predisposing genetic characteristics, marital status, familial status or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

312.    At all times pertinent herein, and as detailed above, Plaintiff was continually harassed on the basis of her race while employed by Cornell. This harassment was unwelcome by Plaintiff.

313.    At all times pertinent herein, Defendants tolerated, condoned, and/or participated in the above-described actions and omissions against Plaintiff because she is a black woman, and a member of a protected class.

314.    Further, as a result of the foregoing, Cornell created a hostile work environment that was permeated with discriminatory intimidation, ridicule and insult; it was intimidating, offensive and abusive to reasonable people because of the severe and pervasive discrimination Plaintiff endured.

315.    Plaintiff perceived the environment to be abusive, hostile, and offensive.

316.    All alleged incidents are sufficiently related in nature and severity and are part of the same hostile work environment practice.

317.    Plaintiff makes a claim against Cornell under all of the applicable paragraphs of New York State Executive Law § 296.

318.    As a result of the foregoing, Cornell otherwise has engaged in unlawful practices as defined in New York State Executive Law § 296.

319.    As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

320.    As a result of the foregoing, Plaintiff was unable, despite reasonable efforts, to find comparable employment.

321.    As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

322.    As a result of the foregoing, pursuant to New York Executive Law § 297(9) punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

323.    Under New York Executive Law § 297(10), Plaintiff is entitled to an award of attorneys' fees and costs.

## AS AND FOR THE THIRD CAUSE OF ACTION AGAINST CORNELL
### *RACE DISCRIMINATION UNDER TITLE VII (42 U.S.C. § 2000e-2, et seq.)*

324.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

325.    Plaintiff is a Black female and identifiable as such.  Accordingly, Plaintiff is in a class of persons protected under 42 U.S.C. § 2000e, *et seq.*

326.    At all times pertinent herein, Cornell is an employer as defined in Title VII of the Civil Rights Act (42 U.S.C. § 2000e).

327.    At all times pertinent herein, Plaintiff was qualified for her position.

328.    At all times pertinent herein, Cornell, via its employees and representatives, acted knowingly, intentionally, recklessly and/or with wanton disregard for the rights and privileges of Plaintiff to have equal employment and non-discriminatory treatment under the law.

329.    At all times pertinent herein, Cornell tolerated, condoned, and/or participated in the above-described actions and omissions against Plaintiff because she is a black woman, and a member of a protected class.

330.    As a result of the foregoing, Cornell discriminated against Plaintiff on the basis of Plaintiff's race, and discriminated against Plaintiff with respect to, *inter alia*, compensation, terms, conditions, or privileges of employment because of Plaintiff's race.

331.    Further, Cornell limited, segregated, and/or classified Plaintiff on the basis of her race, and as a result of that classification, it adversely affected and/or impacted her employment at Cornell up to and including wrongful discharge.

332.    As a result of the foregoing, Cornell discriminated against Plaintiff by terminating her on the basis of her race which deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her race.

333.    Cornell treated white employees more favorably than Plaintiff.

334.     Cornell's rationale for termination was pretextual.

335.     As a result of the foregoing, Cornell otherwise engaged in unlawful practices as defined in Title VII.

336.     As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

337.     As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

338.     As a result of the foregoing, punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

339.     Under Title VII, Plaintiff is entitled to an award of attorneys' fees and costs, including but not limited to expert witness fees.

## AS AND FOR THE FOURTH CAUSE OF ACTION AGAINST CORNELL
### *RACE DISCRIMINATION UNDER NEW YORK STATE EXECUTIVE LAW § 296*

340.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

341.     Cornell is an employer within the meaning of New York State Executive Law § 292.

342.     New York State Executive Law § 296(1)(a) provides that: It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, color, religion, military status, sex, disability, predisposing genetic characteristics, marital status, familial status or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

343.     At all pertinent times herein, Plaintiff was qualified for her position.

344.     At all times pertinent herein, Cornell, via its employees and representatives, acted knowingly, intentionally, recklessly and/or with wanton disregard for the rights and privileges of Plaintiff to have equal employment and non-discriminatory treatment under the law.

345.    At all pertinent times herein, Cornell tolerated, condoned, and/or participated in the above-described actions and omissions against Plaintiff because she is a black woman, and a member of a protected class.

346.    As a result of the foregoing, Cornell discriminated against Plaintiff on the basis of Plaintiff's race, and discriminated against Plaintiff with respect to, *inter alia*, compensation, terms, conditions, or privileges of employment because of Plaintiff's race.

347.    Cornell discharged Plaintiff because of her race.   Further, Cornell limited, segregated, and/or classified Plaintiff on the basis of her race, and as a result of that classification, it adversely affected and/or impacted her employment at Cornell up to and including wrongful discharge.

348.    Cornell's rationale for termination was pretextual.

349.    Cornell treated White employees more favorably than Plaintiff.

350.    Plaintiff makes a claim against Cornell under all of the applicable paragraphs of New York State Executive Law § 296.

351.    As a result of the foregoing, Cornell otherwise has engaged in unlawful practices as defined in New York State Executive Law § 296.

352.    As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

353.    As a result of the foregoing, Plaintiff was unable, despite reasonable efforts, to find comparable employment.

354.    As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

355.    As a result of the foregoing, pursuant to New York Executive Law § 297(9) punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

356.    Under New York Executive Law § 297(10), Plaintiff is entitled to an award of attorneys' fees and costs.

### AS AND FOR THE FIFTH CAUSE OF ACTION AGAINST CORNELL
### *RETALIATION (42 U.S.C. § 2000e-3, et seq)*

357.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

358.    As identified in the foregoing, Plaintiff repeatedly and expressly complained to Cornell about unlawful employment practices, including reporting the racism and sexism she was experiencing in the Cornell work environment.

359.    Further, Plaintiff filed both formal and informal complaints of racism at Cornell, and filed two complaints of racism and retaliation with the EEOC.

360.    By reporting such information to Cornell and making such complaints, Plaintiff was engaging in protected activities under Title VII.

361.    Cornell's termination of Plaintiff because she engaged in protected activities constitutes wrongful retaliation under Title VII.

362.    By the foregoing actions and omissions, Cornell retaliated against Plaintiff for opposing discrimination and engaging in a protected activity under Title VII.

363.    Cornell's rationale for termination was pretextual.

364.    As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

365.    As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

366.    As a result of the foregoing, punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

367.    Under Title VII, Plaintiff is entitled to an award of attorneys' fees and costs, including but not limited to expert witness fees.

### AS AND FOR THE SIXTH CAUSE OF ACTION AGAINST CORNELL
#### *RETALIATION UNDER NEW YORK STATE EXECUTIVE LAW § 296*

368.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

369.    Cornell is an employer within the meaning of New York State Executive Law § 292.

370.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because she has opposed any practices forbidden under this article."

371.    As identified in the foregoing, Plaintiff repeatedly and expressly complained to Cornell about unlawful employment practices, including reporting the racism that she was experiencing in the Cornell work environment.

372.    By reporting such information to Cornell and making such complaints, Plaintiff was engaging in protected activities under New York State Executive Law § 296.

373.    Cornell's termination of Plaintiff because she engaged in protected activities constitutes wrongful retaliation under New York State Executive Law § 296.

374.    By the foregoing actions and omissions, Cornell retaliated against Plaintiff for opposing discrimination and engaging in a protected activity under New York State Executive Law § 296.

375.    Cornell's rationale for termination was pretextual.

376.    Plaintiff makes a claim against Cornell under all of the applicable paragraphs of New York State Executive Law § 296.

377.    As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

378.    As a result of the foregoing, Plaintiff was unable, despite reasonable efforts, to find comparable employment.

379.    As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

380.    As a result of the foregoing, pursuant to New York Executive Law § 297(9) punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

381.    Under New York Executive Law § 297(10), Plaintiff is entitled to an award of attorneys' fees and costs.

## AS AND FOR THE SEVENTH CAUSE OF ACTION AGAINST CORNELL
### *INTENTIONAL DISCRIMINATION, HOSTILE WORK ENVIRONMENT, AND RETALIATION UNDER 42 U.S.C. § 1981*

382.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this Complaint, with the same force and effect as if fully set forth herein.

383.    42 U.S.C. § 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race.

384.    Plaintiff is a Black woman.

385.    Plaintiff was an employee of Cornell pursuant to an employment contract and had rights under the existing contract that she wishes to make and enforce.

386.    Cornell intentionally discriminated against Plaintiff because of her race.

387.    Cornell terminated Plaintiff because of her race.

388.    Plaintiff was subjected to continued harassment as described in the foregoing by Cornell and its employees and this harassment was motivated by Plaintiff's race. This harassment was unwelcome by Plaintiff.

389.    The conduct was so severe and pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile and abusive.

390.    Plaintiff believed her work environment to be hostile or abusive as a result of the continued harassment.

391.    Cornell and its Management level employees, knew or should have known of the abusive conduct since management had enough information to raise the probability of racial harassment in the mind of a reasonable employer.

392.    The continued harassment was so pervasive and open that a reasonable employer would have had to be aware of it.

393.    Defendant Cornell failed to take any prompt remedial action.

394.    As identified in the foregoing, Plaintiff repeatedly and expressly opposed the discrimination to Cornell and on numerous occasions reported the harassment and racism she was experiencing in the Cornell work environment.

395.    Further, Plaintiff informed Cornell that the anonymous email that contained false allegations against her was motivated by racial animus. Plaintiff was immediately told to leave the Cornell and was terminated days later.

396.    By reporting such information to Cornell, Plaintiff was engaging in protected activities under § Cornell's rationale for termination was pretextual.

397.    Plaintiff was terminated because she reported the harassment and racism.

398.    By the foregoing actions and omissions, Cornell retaliated against Plaintiff for opposing discrimination and engaging in a protected activity under § 1981.

399.    Cornell's rationale for termination was pretextual.

400.    As a result of the foregoing, Plaintiff has been damaged in the premises including but not limited to: pain and suffering including statistically determined loss of life expectancy that is unique to black women victims of racism; disruption of family and social life and related personal circumstances; loss of job security; inconvenience and related mental anguish; economic loss, including loss of vocational reputation and status, benefits, promotional opportunities, bonuses, past and future earnings and other employment benefits; impairment and damage to Plaintiff's good name, lasting embarrassment, humiliation anguish; and otherwise was damaged in the premises.

401.    As a result of the foregoing, Plaintiff was unable, despite reasonable efforts, to find comparable employment.

402.    As a result of the foregoing, Plaintiff demands judgment against Cornell in the amount of $35,000,000.00.

403.    As a result of the foregoing, punitive damages are warranted and proper, and the Plaintiff is entitled to an award thereof.

404.    Plaintiff is entitled to an award of attorneys' fees and costs.

**WHEREFORE,** Plaintiff demands judgment against the Defendant in the amount to $35,000,000.00 on each individual cause of action (one through seven); and for such other and further relief which to the Court is just and proper, including punitive damages, interest, and attorneys' fees and costs as may be recoverable by law.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.


DATED:  Ithaca, New York
         October 2, 2024

/s/ *Raymond M. Schlather*
RAYMOND M. SCHLATHER, ESQ.
ATTORNEYS FOR PLAINTIFF
SCHLATHER, STUMBAR, PARKS & SALK, LLP
Office and Post Office Address
200 East Buffalo St., Suite 501
P.O. Box 353
Ithaca, New York 14851-0353
Phone: 607-273-2202
Fax: 607-273-4436